T.C. Memo. 2006-92

UNITED STATES TAX COURT

ANNE C. SNYDER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13874-04.                    Filed May 2, 2006.

<u>William F. Jones</u>, for petitioner.

<u>C. Teddy Li</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined a deficiency in, and
an accuracy-related penalty under section 6662(a)[1] on, peti-
tioner's Federal income tax (tax) for her taxable year 2001 of

---

[1]All section references are to the Internal Revenue Code in
effect for the year at issue.  All Rule references are to the Tax
Court Rules of Practice and Procedure.

$66,497 and $12,926, respectively.

In an amendment to answer, respondent asserted (1) an increase in (a) the deficiency in, and (b) the accuracy-related penalty under section 6662(a) on, petitioner's tax for her taxable year 2001 of $1,273 and $628, respectively, and (2) an increased (a) deficiency in, and (b) accuracy-related penalty under section 6662(a) on, petitioner's tax for that year of $67,770 and $13,554, respectively.

The only issue remaining for decision is whether petitioner is liable for her taxable year 2001 for the accuracy-related penalty under section 6662(a). We hold that she is.

### FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

Petitioner resided in Ellicott City, Maryland, at the time she filed the petition.

Petitioner, who attended three years of college where she majored in education, and E. Bruce Snyder (decedent) were married for about 38 years when he died after a long illness in May 2001. During their marriage, decedent retained Robert Hopkins (Mr. Hopkins) with A.G. Edwards & Sons, Inc. (A.G. Edwards) as their financial advisor.

With Mr. Hopkins's assistance, in December 1994, decedent and petitioner each opened an individual retirement account (IRA) with A.G. Edwards. Petitioner was the primary beneficiary of

decedent's IRA, and decedent was the primary beneficiary of petitioner's IRA. The four children of petitioner and decedent were the contingent beneficiaries of both decedent's IRA and petitioner's IRA.

At a time or times not disclosed by the record, decedent purchased from Sun Life Assurance Company of Canada (Sun Life) two annuity contracts, viz., the MFS Regatta Gold Fixed Annuity (contract no. 76-7600-474212) and the MFS Regatta Gold Fixed/Variable Annuity (contract no. 76-7600-574550), that were in effect when he died on May 14, 2001.[2] (We shall refer to (1) decedent's MFS Regatta Gold Fixed Annuity as decedent's fixed annuity contract, (2) decedent's MFS Regatta Gold Fixed/Variable Annuity as decedent's fixed/variable annuity contract, and (3) both such contracts collectively as decedent's annuity contracts.) Mr. Hopkins of A.G. Edwards was the plan administrator for each of decedent's annuity contracts.

In May or June 2001, Sun Life was notified that decedent had died. Upon receiving notice of decedent's death, Sun Life sent to the plan administrator for each of decedent's annuity contracts (1) a letter dated June 18, 2001, with respect to decedent's fixed annuity contract (Sun Life's June 18, 2001 letter) and (2) a letter dated June 19, 2001, with respect to decedent's

---

[2]It is not clear from the record whether decedent was receiving benefits before he died under the MFS Regatta Gold Fixed Annuity and/or the MFS Regatta Gold Fixed/Variable Annuity.

fixed/variable annuity contract (Sun Life's June 19, 2001 letter).  The respective bodies of those letters, which were virtually identical, stated in pertinent part:

> After review of this contract, it has been determined that Anne Snyder is entitled to the death benefit options.  It is important that she [Anne Snyder] consult a tax or legal advisor before making a decision.  Please have her choose one of the following options:

> **(1) Immediate lump Minimum Death Benefit.**
> The Minimum Death Benefit is calculated by Sun Life and will pay the greatest of the following:
> - Contributions accruing at a rate of 5% annually, minus withdrawals also accruing at a rate of 5% annually.  This accrual will continue until the first day of the month following the 80th birthday of the annuitant or until the contributions or withdrawals have doubled as a result of the accumulation.
> - 100% of the accumulated value on the date of death notification and elected option paperwork is received by Sun Life in good order.
> - Account value on the most recent 7th contract anniversary, plus any contributions, minus any withdrawals since that 7th year anniversary.
> - Cash Surrender Value.  This includes any applicable surrender penalties and Market Value adjustment (MVA - applies to fixed series only)

> **Note: If the Lump Sum option is chosen, we ask that the beneficiary provide the tax withholding information. Sun Life can withhold between 10%-50% for taxes only upon request.**

> **(2) Defer the lump sum payment.**
> The lump sum payment may be taken anytime within five years of the date of death.  A new beneficiary can be named for the deferral period.

> **(3) Annuitize the contract.**
> This option may be chosen within one year of the annuitant's date of death.  If this option is chosen, it is irrevocable.  For additional information regarding

annuitization, please see the enclosed annuitization
kit.

**(4) Re-register the contract.**
In order to proceed, we ask that Anne Snyder send a
letter of instruction that includes the following
information:

- chosen Death Benefit Option (listed above)
  *Note: If the Re-registration option is chosen
  please have her [Anne Snyder] include her date of
  birth and new beneficiary designation.*
- an original signature
- mailing address
- Social Security number
- Signature Guarantee - needed only if the **re-regis-
  tration option** is chosen or if the payout is
  **$250,000.00 or greater.**

\*     \*     \*     \*     \*     \*     \*

Please forward the following documents in addition to the
letter of instruction:

- certified copy of the annuitant's [decedent's] death
  certificate.

On July 9, 2001, petitioner signed and dated Form W-4P,
Withholding Certificate for Pension or Annuity Payments (Form W-
4P), for her taxable year 2001 with respect to decedent's fixed
annuity contract (petitioner's 2001 Form W-4P for decedent's
fixed annuity contract).  In that form, petitioner directed that
no tax was to be withheld from any distribution with respect to
decedent's fixed annuity contract.  The instructions for peti-
tioner's 2001 Form W-4P for decedent's fixed annuity contract
stated in pertinent part:

**Withholding From Pensions and Annuities**

Generally, Federal income tax withholding applies to the taxable part of payments made from pension, profit-sharing, stock bonus, annuity, and certain deferred compensation plans; from individual retirement arrangements (IRAs); and from commercial annuities.  The method and rate of withholding depends on the kind of payment you receive.  Also, because your tax situation may change from year to year, you may want to refigure your withholding each year.  You can change the amount to be withheld by using lines 2 and 3 of Form W-4P.

**Choosing not to have income-tax withheld.**  You * * * can also choose not to have income tax withheld from your payments by using line 1 of Form W-4P. * * *

   *       *       *       *       *       *       *

**Caution:** There are penalties for not paying enough tax during the year, either through withholding or estimated tax payments.

   *       *       *       *       *       *       *

**Nonperiodic payments–10% withholding.**  Your payer must withhold a flat 10% from nonperiodic payments (but see Eligible rollover distribution–20% withholding below) unless you choose not to have income tax withheld.  Distributions from an IRA that are payable on demand are treated as nonperiodic payments.  You can choose not to have income tax withheld from a nonperiodic payment by submitting Form W-4P (containing your correct TIN) to your payer and checking the box on line 1.

   *       *       *       *       *       *       *

**Eligible rollover distribution–20% withholding.**
Distributions you receive from qualified pension or annuity plans (e.g., 401(k) pension plans) or tax-sheltered annu- ities that are eligible to be rolled over tax free to an IRA or qualified plan are subject to a flat 20% withholding. The 20% withholding is required and you cannot choose not to have income tax withheld for eligible rollover distribu- tions.  See Pub. 505 for more details.  However, the payer will not withhold income tax if the entire distribution is transferred by the plan administrator in a direct rollover

to a traditional IRA, qualified pension plan, or tax-sheltered annuity. * * *

On July 9, 2001, petitioner signed and dated Form W-4P for her taxable year 2001 with respect to decedent's fixed/variable annuity contract (petitioner's Form W-4P for fixed/variable annuity contract). In that form, petitioner directed that no tax was to be withheld from any distribution with respect to decedent's fixed/variable annuity contract. The instructions for petitioner's 2001 Form W-4P for decedent's fixed/variable annuity contract were identical to the instructions for petitioner's 2001 Form W-4P for decedent's fixed annuity contract.

On July 17, 2001, Sun Life received an undated letter from petitioner with respect to decedent's fixed annuity contract (petitioner's July 17, 2001 letter with respect to decedent's fixed annuity contract). In that letter, petitioner elected what she referred to as a "lump sum death benefit payment" under decedent's fixed annuity contract and requested that Sun Life "not withhold any taxes from this distribution." Petitioner enclosed with petitioner's July 17, 2001 letter with respect to decedent's fixed annuity contract, inter alia, petitioner's 2001 Form W-4P for decedent's fixed annuity contract, including the instructions to such form, a form entitled "ANNUITIZATION DATA FORM" on which no information was contained and which had been crossed out, and a form entitled "Direct Deposit Authorization" in which petitioner directed Sun Life to deposit directly into

her checking account at Bank of America (petitioner's Bank of America checking account)[3] any payments that Sun Life made to her under decedent's fixed annuity contract.

On July 17, 2001, Sun Life received an undated letter from petitioner with respect to decedent's fixed/variable annuity contract (petitioner's July 17, 2001 letter with respect to decedent's fixed/variable annuity contract). In that letter, petitioner elected what she referred to as a "lump sum death benefit payment" under decedent's fixed/variable annuity contract and requested that Sun Life "not withhold any taxes from this distribution." Petitioner enclosed with petitioner's July 17, 2001 letter with respect to decedent's fixed/variable annuity contract, inter alia, petitioner's 2001 Form W-4P for decedent's fixed/variable annuity contract, including instructions to such form, and a form entitled "Direct Deposit Authorization" in which petitioner directed Sun Life to deposit directly into her Bank of America checking account any payments that Sun Life made to her under decedent's fixed/variable annuity contract.

On November 16, 2001, the plan administrator of decedent's fixed annuity contract and decedent's fixed/variable annuity contract sent to Sun Life a letter (A.G. Edwards November 16, 2001 letter) with respect to both of those contracts, which Sun

_____

[3]Before decedent died, petitioner's Bank of America checking account was a checking account maintained by both decedent and petitioner.

Life received on November 19, 2001. Included with that letter were two death certificates for decedent. A.G. Edwards November 16, 2001 letter stated in pertinent part:

> As per our conversation today, please find the enclosed original death certificates to liquidate the above policies.
>
> Also, Mrs. Snyders bank account number is 007071707352, you have the rest of the information on file.
>
> I am under the assumption that these will be liquidated on November 19, 2001, and all any monies due per your calculation will be deposited into the above account on Tuesday, November 20th, 2001. If this is NOT a correct assumption, please advise Robert Hopkins or myself immediately at (800) 688-9334.

On November 26, 2001, petitioner received into her Bank of America checking account a payment of $25,940.28 from Sun Life with respect to decedent's fixed annuity contract.

On November 26, 2001, petitioner received into her Bank of America checking account a payment of $170,429.52 from Sun Life with respect to decedent's fixed/variable annuity contract.

Sun Life reported to respondent for petitioner's taxable year 2001 the gross distributions of $25,940.28 and $170,429.52 that it made to petitioner during that year with respect to decedent's fixed annuity contract and decedent's fixed/variable annuity contract, respectively. In this connection, Sun Life prepared separate Forms 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc. (Sun Life Form 1099-R), for 2001 that showed Sun Life as the payer and petitioner as the recipient of such respec-

tive gross distributions. The address for petitioner shown in each such form was the same as the address shown in (1) the tax return that petitioner filed for her taxable year 2001 and (2) the petition that she filed with the Court. One Sun Life Form 1099-R showed a "Gross Distribution" of $25,940.28 and a "Taxable Amount" of $25,940.28, which was the amount of the distribution that Sun Life paid to petitioner in 2001 with respect to decedent's fixed annuity contract. The other Sun Life Form 1099-R showed a "Gross Distribution" of $170,429.52 and a "Taxable Amount" of $170,429.52, which was the amount of the distribution that Sun Life paid to petitioner in 2001 with respect to decedent's fixed/variable annuity contract. The "Distribution Code(s)" shown in each Sun Life Form 1099-R was "4", and the box entitled "IRA/SEP/SIMPLE" was checked.[4]

During 2001, petitioner received interest of $400 and other income of $1,365 from American General Life Insurance Company (American General).

During 2001, A.G. Edwards made the following gross distributions totaling $8,500 from decedent's IRA, with respect to which an election had been made to withhold tax of 10 percent, by issuing the following checks to decedent:

---

[4]The instructions to Form 1099-R for 2001 describe distribution code "4" as "Death." Those instructions also state: "If the IRA/SEP/SIMPLE box is checked, you have received a traditional IRA, SEP, or SIMPLE distribution."

| Date of A.G. Edwards Check | Normal Distribution | Tax Withheld | Gross Distribution |
|---|---|---|---|
| February 2, 2001 | $1,125 | $125 | $1,250 |
| February 9, 2001 | 405 | 45 | 450 |
| March 1, 2001 | 1,530 | 170 | 1,700 |
| April 3, 2001 | 1,530 | 170 | 1,700 |
| May 1, 2001 | 1,530 | 170 | 1,700 |
| June 12, 2001 | 1,530 | 170 | 1,700 |
| Subtotals | $7,650 | $850 | $8,500 |
| | | Total | $8,500 |

The above-described checks issued by A.G. Edwards were deposited into petitioner's Bank of America checking account.[5]

On June 12, 2001, petitioner sent to A.G. Edwards a death certificate for decedent and a preprinted form prepared by A.G. Edwards entitled "A.G. Edwards Self-Directed IRA Request Form" (A.G. Edwards IRA request form). In that form, petitioner directed A.G. Edwards to make a total distribution rollover of decedent's IRA into petitioner's IRA because of decedent's death.

In July 2001, petitioner requested A.G. Edwards to make gross distributions to her from petitioner's IRA of $1,700 a month. Pursuant to that request, during 2001, A.G. Edwards made the following gross distributions totaling $10,200 from peti- tioner's IRA, with respect to which an election had been made

---

[5]See supra note 3. Decedent endorsed the checks dated Feb. 2 and 9, Mar. 1, and Apr. 3, 2001. The only endorsement on each of the checks dated May 1 and June 12, 2001, was "FOR DEPOSIT ONLY".

to withhold tax of 10 percent, by issuing the following checks to petitioner:

| Date of A.G. Edwards Check | Normal Distribution | Tax Withheld | Gross Distribution |
|---|---|---|---|
| July 10, 2001 | $1,530 | $170 | $1,700 |
| August 6, 2001 | 1,530 | 170 | 1,700 |
| August 31, 2001 | 1,530 | 170 | 1,700 |
| September 28, 2001 | 1,530 | 170 | 1,700 |
| November 16, 2001 | 1,530 | 170 | 1,700 |
| December 3, 2001 | 1,530 | 170 | 1,700 |
| Subtotals | $9,180 | $1,020 | $10,200 |
| Total | | | $10,200 |

The above-described checks issued by A.G. Edwards were endorsed by petitioner and deposited into petitioner's Bank of America checking account.

A.G. Edwards prepared and issued to decedent and petitioner separate Forms 1099-R (A.G. Edwards Form 1099-R) for 2001 with respect to the gross distributions of $8,500 and $10,200 that A.G. Edwards made during that year from decedent's IRA and petitioner's IRA, respectively. The address for decedent and for petitioner shown in the respective A.G. Edwards Forms 1099-R issued to them was the same as the address shown in (1) the tax return that petitioner filed for her taxable year 2001 and (2) the petition that she filed with the Court. A.G. Edwards Form 1099-R issued to decedent showed A.G. Edwards as the payer and decedent as the recipient of a "Gross Distribution" of $8,500 and a "Taxable Amount" of $8,500, which was the total amount of

the gross distributions that A.G. Edwards made to decedent during 2001 from decedent's IRA. A.G. Edwards Form 1099-R issued to petitioner showed A.G. Edwards as the payer and petitioner as the recipient of a "Gross Distribution" of $10,200 and a "Taxable Amount" of $10,200, which was the total amount of the gross distributions that A.G. Edwards made to petitioner during 2001 from petitioner's IRA. The "Distribution Code(s)" shown in the respective A.G. Edwards Forms 1099-R issued to decedent and petitioner was "7", and the box entitled "IRA/SEP" was checked.[6]

Petitioner and decedent timely filed a joint Form 1040, U.S. Individual Income Tax Return, for their taxable year 2001 (2001 joint return). In that return, petitioner reported wages of $18,672 paid to petitioner by Chateau Builders of Maryland Inc., taxable interest of $62, ordinary dividends of $21, total IRA distributions of $11,111 paid to petitioner by Allfirst Bank, and Social Security benefits of $20,802, of which petitioner reported $4,134 was taxable. In the 2001 joint return, petitioner reported total income of $34,000, total tax of $3,158, tax withheld of $2,956, estimated tax payments of $700, and an overpayment of $498.

---

[6]The instructions to Form 1099-R for 2001 describe distribution code "7" as "Normal distribution." Those instructions further indicate that if the "IRA/SEP" box is checked, the recipient has received a traditional IRA or SEP distribution.

In the 2001 joint return, petitioner did not report interest income of $400 and other income of $1,365 paid during 2001 by American General.  Nor did petitioner report in the 2001 joint return the gross distributions of $25,940.28 and $170,429.52 paid during 2001 by Sun Life with respect to decedent's fixed annuity contract and decedent's fixed/variable annuity contract, respectively.  In addition, petitioner did not report in the 2001 joint return the gross distributions of $8,500 and $10,200 made during 2001 by A.G. Edwards from decedent's IRA and petitioner's IRA, respectively.

In the notice of deficiency (notice) that respondent issued to petitioner for her taxable year 2001, respondent determined to include in gross income for that year:  (1) Interest income of $400 paid by American General, (2) other income of $1,365 paid by American General, (3) a gross distribution of $25,940 paid by Sun Life with respect to decedent's fixed annuity contract, (4) a gross distribution of $170,429 paid by Sun Life with respect to decedent's fixed/variable annuity contract, and (5) gross distributions of $10,200 made by A.G. Edwards from petitioner's IRA.[7]  Respondent also determined in the notice that petitioner is

_____

[7]Respondent indicated in the notice that petitioner did not report in the 2001 joint return gross distributions of $8,500 made by A.G. Edwards during that year from decedent's IRA. Respondent failed to include in the computation of the $66,497 deficiency determined in the notice those unreported gross distributions.  See infra note 10.

liable for her taxable year 2001 for a $12,926 accuracy-related penalty under section 6662(a).

In the amendment to answer, respondent asserted an increased deficiency in, and an increased accuracy-related penalty under section 6662(a) on, petitioner's tax for her taxable year 2001 of $67,770 and $13,554, respectively.[8]

## OPINION

The only issue remaining for our consideration is whether petitioner is liable for her taxable year 2001 for the accuracy-related penalty under section 6662(a).

Pursuant to section 7491(c), respondent bears the burden of production with respect to the issue presented under section 6662. In order to meet respondent's burden of production, respondent must come forward with sufficient evidence indicating that it is appropriate to impose the accuracy-related penalty in this case. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). The burden of proof remains with petitioner with respect to the accuracy-related penalty that respondent determined in the notice.[9] See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Higbee v. Commissioner, supra at 446-447. Respondent

_____

[8]See supra note 7 and infra note 10.

[9]Thus, although respondent bears the burden of production with respect to the accuracy-related penalty determined in the notice, respondent "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions." Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

bears the burden of proof with respect to the increase in that accuracy-related penalty that respondent asserted in the amendment to answer.[10]  Rule 142(a).  However, our resolution of whether petitioner is liable for the accuracy-related penalty does not depend on who has the burden of proof.

---

[10]If we were to sustain respondent's position in the amendment to answer that petitioner is liable for her taxable year 2001 for an accuracy-related penalty under sec. 6662(a) in excess of the amount of such penalty determined in the notice, it would be necessary for the parties to determine under Rule 155 the increased amount of such penalty attributable to petitioner's underpayment for that year.  That is because respondent incorrectly calculated the increased amount of the accuracy-related penalty under sec. 6662(a) asserted in the amendment to answer.

The increased deficiency in, and the increased accuracy-related penalty under sec. 6662(a) on, petitioner's tax for her taxable year 2001 that respondent asserted in the amendment to answer are attributable to gross distributions totaling $8,500 that petitioner concedes were made during 2001 from A.G. Edwards and were not reported in the 2001 joint return.  See supra note 7.  Respondent calculated the increased amount of the accuracy-related penalty under sec. 6662(a) to be $13,554.  We believe that respondent erred in making that calculation.  It appears that respondent calculated such increased amount as a percentage of the increased amount of the deficiency that respondent asserted in the amendment to answer.  However, the accuracy-related penalty under sec. 6662(a) is equal to 20 percent of the portion of the underpayment of tax to which that section applies.  In the instant case, the increased deficiency for petitioner's taxable year 2001 that respondent asserted in the amendment to answer and that petitioner concedes is not equal to the underpayment for that year to which respondent asserts sec. 6662 applies.  In this connection, we note that in the notice respondent determined that the total tax withheld for taxable year 2001 was $4,825, and not $2,956 as reported in the 2001 joint tax return.  In addition, petitioner reported in that return, and respondent did not adjust in the notice, $700 of estimated tax payments for her taxable year 2001.

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to (1) negligence or disregard of rules or regulations, sec. 6662(b)(1), or (2) a substantial understatement of tax, sec. 6662(b)(2).

It is respondent's position that petitioner's underpayment for her taxable year 2001 was attributable to (1) negligence or disregard of rules or regulations and (2) a substantial understatement of tax. We shall address only whether petitioner's underpayment for 2001 was attributable to a substantial understatement of tax. That is because our resolution of that question is determinative of whether petitioner is liable for the accuracy-related penalty under section 6662(a).[11]

For purposes of section 6662(b)(2), an understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in such return, sec. 6662(d)(2)(A), and is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown in the return for that taxable year or $5,000, sec. 6662(d)(1)(A). The amount of the understatement is to be reduced by that portion of the understatement which is attributable to

_____

[11]See _supra_ note 10.

(1) "the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment", sec. 6662(d)(2)(B)(i), or (2) any item if (a) "the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return", sec. 6662(d)(2)(B)(ii)(I), and (b) "there is a reasonable basis for the tax treatment of such item by the taxpayer", sec. 6662(d)(2)(B)(ii)(II).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess such taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner concedes that she should have reported in the 2001 joint return the respective distributions that Sun Life, A.G. Edwards, and American General made during 2001. Petitioner does not dispute that the understatement of tax in the 2001 joint return exceeds the greater of 10 percent of the tax required to be shown in that return or $5,000. See sec. 6662(d)(1)(A). On

the record before us, we find that respondent has satisfied respondent's burden of production under section 7491(c) with respect to the accuracy-related penalty.

In support of her position that she is not liable for the accuracy-related penalty under section 6662(a), petitioner claimed at trial[12] that she never received:  (1) The separate Sun Life Forms 1099-R showing the gross distributions made by Sun Life during 2001 of $25,940 and $170,429 with respect to decedent's fixed annuity contract and decedent's fixed/variable annuity contract, respectively; (2) the separate A.G. Edwards Forms 1099-R showing the gross distributions made by A.G. Edwards during 2001 totaling $8,500 and $10,200 from decedent's IRA and petitioner's IRA, respectively; and (3) the separate Forms 1099 showing the distributions made by American General during 2001 of $400 of interest income and $1,365 of other income, respectively.

In further support of her position that she is not liable for the accuracy-related penalty under section 6662(a), petitioner claimed at trial that she believed that the respective gross distributions of $25,940 and $170,429 made by Sun Life during 2001 with respect to decedent's annuity contracts and the respective gross distributions of $8,500 and $10,200 made by A.G.

---

[12]At the conclusion of the trial in this case, the Court directed the parties to file simultaneous opening briefs and simultaneous answering briefs.  However, petitioner filed a notice of intent not to file posttrial briefs.

Edwards during 2001 from decedent's IRA and petitioner's IRA were death benefits that are not taxable. Petitioner explained at trial that she held that belief because some of her friends who were widows told her during informal discussions that death benefits are not taxable.[13]

We turn first to petitioner's claim at trial that she did not receive any of the Forms 1099 from Sun Life, A.G. Edwards, or American General showing the respective distributions that those companies made during 2001. Petitioner's claim that she received none of those forms strains credulity, and we reject it. The record does not establish, and petitioner does not contend, that the separate Sun Life Forms 1099-R showing the respective gross distributions made by Sun Life during 2001 with respect to decedent's annuity contracts and the separate A.G. Edwards Forms 1099-R showing the respective gross distributions made by A.G. Edwards during 2001 from decedent's IRA and petitioner's IRA were addressed to an incorrect address.[14] Nor does the record establish, and petitioner does not contend, that she was having any problems in receiving mail around the time the payers in question

[13]Petitioner did not give a similar explanation at trial as to why she did not include in gross income in the 2001 joint return the respective distributions of $400 of interest income and $1,365 of other income made by American General during 2001.

[14]The record does not contain copies of any Form 1099 that American General issued with respect to the respective distributions during 2001 of interest and other income.

(viz., Sun Life, A.G. Edwards, and American General) would have been required to issue Forms 1099 (i.e., by no later than January 31, 2002).

We turn now to petitioner's claim at trial that she believed that the respective gross distributions made by Sun Life and A.G. Edwards during 2001 were death benefits that are not taxable because some of her widowed friends told her during informal discussions that death benefits are not taxable. We find that it was unreasonable for petitioner to rely on any such informal statements of her friends in concluding that the respective gross distributions that Sun Life and A.G. Edwards made during 2001 are not taxable. In determining whether a taxpayer acted with reasonable cause and in good faith, generally the most important factor to consider "is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioner should have consulted a professional, and not her friends, about the tax treatment of the respective gross distributions that Sun Life and A.G. Edwards made during 2001.[15] The record does not establish, and peti-

---

[15]We note that the record does not establish that A.G. Edwards referred to the respective gross distributions that it made during 2001 as death benefits. The record shows that such distributions were from decedent's IRA and petitioner's IRA. Nor does the record establish that American General referred to the respective distributions that it made during 2001 as death benefits. The record shows that such distributions were of interest and other income. Although the record establishes that

(continued...)

tioner does not contend, that she consulted a professional about the tax treatment of such distributions.[16]

On the record before us, we find that petitioner did not have reasonable cause for, and did not act in good faith with respect to, any portion of the underpayment for her taxable year 2001. See sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

Based upon our examination of the entire record before us, we find that petitioner is liable for her taxable year 2001 for

---

[15](...continued) in Sun Life's June 18, 2001 letter and Sun Life's June 19, 2001 letter Sun Life indicated that "Anne Snyder is entitled to the death benefit options" and that one of those options was an "Immediate lump Minimum Death Benefit", the record shows that "the death benefit options" available were under decedent's annuity contracts. Only a death benefit paid under a life insurance contract because of the death of the insured is to be excluded from gross income. Sec. 101(a). If petitioner had consulted with a professional about the tax treatment of the respective gross distributions that Sun Life made during 2001 with respect to decedent's annuity contracts, she would have been advised that a so-called death benefit paid under an annuity contract is not to be excluded from gross income because of the death of the annuity contract holder. See sec. 72.

[16]It is significant that petitioner failed to call as witnesses at trial (1) the plan administrator to testify about the respective gross distributions that Sun Life made during 2001 with respect to decedent's annuity contracts, (2) a representative of A.G. Edwards to testify about the respective gross distributions that A.G. Edwards made during 2001 from decedent's IRA and petitioner's IRA, and (3) the accountant who prepared the 2001 joint return to testify about why the respective distributions made by Sun Life, A.G. Edwards, and American General during 2001 were not reported in that return. We presume that petitioner did not call those witnesses because their respective testimonies would not have been favorable to petitioner's position in this case. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 514 (10th Cir. 1947).

the accuracy-related penalty under section 6662(a) that is attributable to petitioner's underpayment for that year.[17]

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.

---

[17]The amount of the accuracy-related penalty under sec. 6662(a) for which petitioner is liable is an amount that is in excess of the amount of such penalty determined in the notice and is to be determined under Rule 155. See <u>supra</u> note 10.